# Richmond

RUSSELL C. HARRIS v. COMMONWEALTH OF VIRGINIA.

April 22, 1946.

Record No. 3059.

Present, All the Justices.

The opinion states the case.

*W. A. Hall, Jr.*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *V. P. Randolph, Jr., Assistant Attorney General*, for the Commonwealth.

SPRATLEY, J., delivered the opinion of the court.

Russell C. Harris was indicted for breaking into and entering, on February 16, 1945, the gasoline service station of H. T. Cox in the city of Richmond, and stealing therefrom United States currency in the amount of $15.04 and "one glass bank and 65 gasoline coupons," the money and

property of H. T. Cox. No specific value was placed upon the last named property. Upon his trial, a jury being waived, he was found guilty by the trial court and his punishment fixed at five years in the State penitentiary.

This is a companion case to that of *Miller* v. *Commonwealth, ante,* page 17, wherein Miller was found guilty by a jury and his punishment fixed at four years in the penitentiary, in which an opinion has been handed down this day.

■ The petition for a writ of error in this case does not comply with Rule XIV of this court. It contains neither a clear statement of the facts nor a precise assignment of the errors relied on. The facts are referred to in what are termed four propositions, discussions of law and facts, evidently intended as four assignments of error. This practice does not comply with our rules, and should not be followed.

The evidence is certified in narrative form. It may be briefly summarized and stated as follows:

About two o'clock in the morning of Saturday, February 17, 1945, two Richmond city police officers, S. E. Fortune and A. L. Tatum, were cruising in a police car on Bainbridge street near Carter Jones Park in South Richmond, when they saw two men come out of Toler street. The police officers rode on and around, but kept a watch on the men. The men disappeared; but shortly thereafter they were observed walking under a street light. The officers turned the lights off the police car and drove up to them before they were noticed. They then recognized the two men as Russell C. Harris and Wilson V. Miller. They talked to them before they got out of the car, and the two men said that they had been over in Carter Jones Park shooting crap. Fortune noticed that the front pockets of the men were full of something. He put his hands on their pants, and discovered it was money. When asked where they got the money, they both said they had won it in a crap game in the above-named park.

The police officers took the men to the police station, and told them that they would be held for a few minutes

until it could be ascertained whether any place on the beat of the officers had been broken into. When the men got in the car, a screw driver was observed in the pocket of Harris. Sergeant Hall, at the police station, ordered the men to be held at the station, while he started checking the beat of the officers at one end and the officers checked the other end. About fifteen or twenty minutes after leaving Miller and Harris at the station, the officers received a call from Sergeant Hall telling them to meet him at Cox's service station, as that station had been broken into, and to bring the screw driver found on Harris. The officers went to the station, carrying the screw driver with them, and found that it fitted the marks on the service station door. They got Mr. and Mrs. Cox to come to the station and tell them what was missing. They were given a list of gasoline ration coupons, about $200 in money and a little Standard Oil Company bank. They went back to the station and questioned Miller and Harris. Sixty-five gasoline coupons were found stuck in a sock inside a shoe of Harris and $15.04 in his pockets, when he was stripped and searched. One of these coupons bore a license number which Fortune happened to know belonged to C. R. Lawson, the officer having seen it often. This license number was 5116, the same as the address of Lawson, 5116 Devonshire Road. Another of these coupons, number 5116, was taken off of Miller, together with other coupons bearing different license numbers.

Lawson was called on the telephone, and when asked if he bought any gasoline at Cox's service station, replied that he had used two A-14 gasoline coupons, with license number 5116 on them, in that station that night just before dark. He stated that he usually purchased his gasoline on Saturday morning; but on Friday afternoon he noticed a gasoline truck at Cox's station; that he went home, ate his supper, and told his wife he had better get his gas that evening. He also said that the station of Cox was "the only place that he had cashed any gasoline coupons along about that time." Among the coupons found on Miller were some bearing the license number 25048, belonging to P. H. Gabriel, who said he had

cashed coupons bearing that number with Cox on the evening of February 16, 1945.

Miller and Harris were asked to take the officers to the place where they had been shooting crap. They were taken separately. Harris was taken first to Carter Jones Park. From there he took officer Fortune to an alley between Twenty-sixth and Twenty-seventh streets, and told Fortune that was the place where the crap game took place. Fortune said that the spot Harris showed him was under a street light and up against a garage where it was impossible for anyone to shoot crap, because the ground was covered there with grass three or four inches high, there was a crack under the garage door about three inches high, and the dice would have rolled under the door.

Officer Tatum corroborated Fortune in respect to the alley as the location of the crap game pointed out by Harris.
. Sergeants Inman and Hall, of the police force, also testified that Harris told them he had won the gasoline coupons in a crap game in Carter Jones Park.

Russell C. Harris testified that he was twenty-two years of age, and lived in South Richmond; that he had been discharged from the United States Navy after two years and seven months service with a bad conduct discharge; that his discharge was not "dishonorable"; and that he expected to be recalled to the Navy because the charge against him related only to drawing mess rations, which charge he could satisfactorily explain when he was able to obtain a certain witness. He undertook to explain the possession of the loose change and the gasoline ration coupons as follows:

He said he left a pool room about nine o'clock Friday night and attended a moving picture show until shortly before midnight; that he then returned to the pool room and later went to a place called Wallace's Grill; and that he there heard that a crap game was going on at Carter Jones Park. Upon arriving at the park, he saw a crap game was going on at the baseball backstop. He then went to a spring with two boys who had been watching the game at the backstop; that he left the spring with the two boys and

went to the alley between Twenty-sixth and Twenty-seventh streets, and started a game with the two boys; and that after "breaking" these boys, he went to the backstop and got in that crap game and there won the gasoline coupons. He told the officers that he was on his way home, about half a block away, and Miller was accompanying him to borrow an overcoat. He said he and Miller got the coupons from a man who ran a gasoline station in the west end of Richmond, and that the man, whose name he did not know, told him that he would meet them at Seventh and Broad streets, Richmond, the next day at twelve-thirty o'clock p. m., and redeem the coupons; and that if the man failed to show up, he knew where he could sell them. He admitted he told the police that he had been in crap game at Carter Jones Park, and there had won some money; and that he had put the coupons in his sock while talking to the three policemen in the station house, because he knew he didn't "have any business with them," and if they found them on him "there would be trouble." He said that he and Miller were continuously questioned by the police officers and they repeatedly denied that they had anything to do with breaking into Cox's service station or taking anything therefrom. He also said that when the officers took him to the Carter Jones Park and asked him where the crap game took place, they did not ask him about the gasoline coupons, and he took them to the alley between Twenty-sixth and Twenty-seventh streets, and told them a crap game took place there. He explained that the screw driver found in his pocket had been used by him earlier in the evening at home to prize a piece of wood off a fence for fuel, and that he just came off with it in his pocket, forgetting that he had it.

Harris was unable to identify any person who told him about a crap game at the park or with whom he engaged in the games of crap. He stated that he did not first get into the game at the park because he did not have sufficient money until he had shot crap in the alley and won some money from the boys he there played with. When asked

if it wasn't too dark to play at the backstop, he replied that they were using flashlights.

He testified that he answered all of the questions of the police officers and did their bidding because he was afraid that if he refused to answer them, or to accompany them to the spot where the gambling took place, or resisted their efforts to secure information in any way, his defense would be prejudiced, or that physical violence would be inflicted upon him. However, he relates no violence to his person nor any threats of the officers by word or deed.

Cox's service station was distant about a mile and a half from the point of arrest. Wallace's Grill, on Hull street, was also distant about a mile and a half from the same point.

The defendant first contends that the trial court erred in refusing to quash the indictment on the ground it failed to specify the denomination of the currency alleged to have been stolen. Here, he has abandoned that ground in view of Virginia Code, 1942 (Michie), section 4870, which makes such a specification unnecessary. He now contends that the failure to allege in the indictment the value of each article of property charged to have been stolen makes the charge of housebreaking defective.

The indictment was drawn under Virginia Code, 1942 (Michie), section 4439, and contains a single count for housebreaking and larceny. Under that composite count, the general verdict of guilty was a conviction of the offense of housebreaking. *Walters* v. *Commonwealth*, 159 Va. 903, 165 S. E. 495; *Myers* v. *Commonwealth*, 132 Va. 746, 111 S. E. 463.

The averment of the intention to steal was sufficient to charge the statutory offense of housebreaking without the averment of the actual theft, the charge of larceny, either petty or grand, if proven, being the best evidence of the intent with which the breaking was committed. The allegation of larceny is only to show the intent. *Vaughan* v. *Commonwealth*, 17 Gratt. (58 Va.) 576; *Wright* v. *Commonwealth*, 82 Va. 183; *Clark* v. *Commonwealth*, 135 Va.

490, 115 S. E. 704; *Stapleton* v. *Commonwealth*, 140 Va. 475, 124 S. E. 237.

The second assignment of error is to the refusal of the trial court to require the Commonwealth to specify whether the alleged offense occurred on the 16th or 17th of February, 1945. The defendant knew that the night of February 16th-17th was the time under consideration, and that it was impossible to specify the exact hour during that night when it was committed. No request for a continuance was made, nor any reason given therefor.

In a felony case the Commonwealth may prove the commission of a crime charged on a date different from that alleged in the indictment. *Puckett* v. *Commonwealth*, 134 Va. 574, 113 S. E. 853; *Stapleton* v. *Commonwealth, supra.*

By Virginia Code, 1942 (Michie), section 4875, it is provided that no indictment shall be deemed invalid "for omitting to state, or stating imperfectly, the time at which the offense was committed when time is not the essence of the offense."

It is next contended that the court erred in admitting the testimony of the officers as to the statements of the accused with reference to the place where the crap game took place, on the ground that the statements were involuntary and were obtained by coercion. In support thereof, the defendant cites a number of cases from the United States Supreme Court involving the use of third degree methods to an extent which vitiated the confessions of the accused.

Here there was absolutely no evidence that the defendant was terrorized or subjected to actual or implied violence, or undue duress. The accused was arrested upon reasonable suspicion. Having been lawfully arrested, a search of his person was proper and the evidence produced admissible. *Quivers* v. *Commonwealth*, 135 Va. 671, 115 S. E. 564. The investigation was conducted in an orderly and proper manner. Harris readily acquiesced in showing the police where the crap game was alleged to have taken place in attempting to support his explanation of possession of the gasoline ration coupons. He made no protest and

willingly accompanied them. His statements and his explanations were free and voluntary. *Johnson* v. *Commonwealth,* 184 Va. 466, 35 S. E. (2d) 770, and cases cited therein.

The opinion of the trial judge, hearing the case without the intervention of a jury, that the admissions were voluntary, has the same weight as a jury's verdict upon the same issue. The contention of the defendant is without merit.

The fourth assignment of error is that the judgment of the court was contrary to the law and the evidence, and without evidence to support it. This assignment is likewise without merit.

Harris was found with his pocket full of money, $15.04 in "change", and with sixty-five gasoline ration coupons, which had not been issued to him, secreted on his person, within a short time after the filling station had been broken into and entered. One of the coupons found was identified about as well as identification can be made of such an article. His explanation as to the acquisition of the coupons is not wholly credible. His account of his actions during the evening, particularly with reference to the crap games in which he was engaged, was confusing and lacking in many important details. His conflicting statements as to the location of the crap game, his failure to give the names of any of his gambling companions, or the name of the man who was to redeem the ration coupons, the evidence of the condition of the alleged location of the crap game, and the necessity to use a flashlight, and the impractical, if not impossible, operation of such a game by flashlight, all point to the unworthiness of his testimony, as a whole.

It seems rather unlikely that Harris and his companion would trust an unknown man for ration stamps as a pledge, and then secrete the stamps in various places about their persons. It is strange that he and his companion both possessed such stamps from a service station so recently broken into and entered.

All of the circumstances unerringly point to the guilt of

the accused. In effect, his explanation is unbelievable. It is confused and contradictory in essential respects.

In *Wright* v. *Commonwealth*, 82 Va. 183, this is quoted with approval:

" 'Though the mere possession of the stolen property might not be *prima facie* evidence of the burglary or housebreaking charge, yet in connection with other evidence of such burglary or housebreaking evidence of such possession of stolen goods is admissible; and upon proof of a larceny having been committed and of the goods stolen having been found shortly afterwards, in possession of the prisoner, the general rule will attach that \* \* \* it is incumbent upon the prisoner to prove how he came by the property, otherwise the presumption is, that he obtained it feloniously.' (Sec. 2, Russell on Crimes, Ed. 1887, p. 123; Davis' Crim. Law, p. 193; 3 Greenleaf, Evidence, sec. 31; 3 Robb Practice, Old, p. 224.)"

The facts of the present case bring it within the rule stated in *Drinkard* v. *Commonwealth*, 163 Va. 1074, 178 S. E. 25, as follows:

"But when evidence has been introduced, which, if believed, establishes that a house has been broken and entered and goods stolen therefrom, and warrants an inference beyond a reasonable doubt that the breaking and entering and the larceny of the goods were committed at the same time, by the same person or persons, as a part of the same transaction, upon principle and authority, the exclusive possession of the stolen goods shortly thereafter, unexplained or falsely denied, has the same efficiency to give rise to an inference that the possessor is guilty of the breaking and entering as to an inference that he is guilty of the larceny. In such a case the rules, with reference to whether the possession proven is sufficient to warrant an inference beyond a reasonable doubt that the possessor is guilty of the breaking and entering with intent to commit larceny, are practically the same as those applying with reference to whether it is sufficient to warrant an inference beyond a reasonable doubt that the possessor is guilty of the larceny.

*Branch* v. *Commonwealth*, 100 Va. 837, 839, 41 S. E. 862;
*Myers* v. *Commonwealth*, 132 Va. 746, 762, 111 S. E. 463;
*Knickerbocker* v. *People*, 43 N. Y. 177."

For the foregoing reasons, we are of opinion to affirm the judgment of the trial court.

*Affirmed.*